| | |
|---|---|
| **Michael John McLeod**, et al.<br>Individually And On Behalf of All Others<br>Similarly Situated,<br><br>**PLAINTIFFS,**<br><br>**vs.**<br><br>**VALVE CORPORATION**<br>a Washington corporation,<br><br>**DEFENDANT** | **CASE NO.** _____<br><br>**JURY TRIAL DEMANDED** |

## CLASS ACTION COMPLAINT

Plaintiff Michael John McLeod ("Plaintiff"), individually, and on behalf of all others similarly situated, by and through counsel, brings this action against Valve Corporation, and states as follows:

## NATURE OF THE CASE

1.     Competitive video gaming is a multi-billion dollar business.  The industry is just like another major sport along with football, basketball and baseball, and is generally called eSports.  And just like major sports, eSports has its own professional players, organized leagues and even weekly nationally televised contests on the cable station TBS[1], all sponsored by major corporate advertising with companies like Buffalo Wild Wings and Arby's.[2]

2.     Just like traditional sports, eSports has become the subject of gambling and wagering on outcomes of matches between professional teams.  An estimated $2.3 billion was wagered on eSports in 2015 by more than 3 million people.[3]  Like traditional sports, the vast

---

[1] http://www.e-league.com/teams/
[2] http://www.e-league.com/news/official-marketing-partners
[3] http://www.bloomberg.com/features/2016-virtual-guns-counterstrike-gambling/

majority of this wagering takes place through an unregulated economy on websites mostly based outside of the United States. However, unlike traditional sports, the people gambling on eSports are mostly teenagers.[4] Also unlike traditional sports, the company that makes the product being wagered on is directly profiting from that wagering.[5]

3. Defendant Valve Corporation ("Valve"), headquartered in Bellevue, Washington, owns the sports league product and is a key component in the online gaming marketplace through its Steam platform. Valve has knowingly allowed an illegal online gambling market and has been complicit in creating, sustaining and facilitating that market.

4. Valve does this through its e-gaming phenomenon product Counter-Strike: Global Offensive ("CS:GO" or "Counter-Strike"). More than 380,000 people are playing Counter-Strike worldwide at any given time.[6] CS:GO is the subject of TBS weekly e-gaming matches, and is the main driver of the pro-gaming cultural phenomenon. CS:GO matches are streamed live on websites like Twitch in addition to the TBS weekly league show.

5. Defendant Valve knowingly allowed, supported, and/or sponsored illegal gambling by allowing millions of Americans to link their individual Steam accounts to third-party websites such as CSGO Lounge ("Lounge"), CSGO Diamonds ("Diamonds"), and OPSkins (collectively, "unnamed co-conspirators"). Counter-Strike players can purchase CS:GO Skins ("Skins"), weapons with different textures that can be used during gameplay of Counter-Strike, through Steam, Valve's online marketplace. These Skins can then easily be traded and used as collateral for bets placed on Lounge and/or Diamonds through linked Steam accounts. In

---

[4] *Id.*
[5] *Id.*, And need source for VALVE GETS A CUT
[6] http://www.bloomberg.com/features/2016-virtual-guns-counterstrike-gambling/

the eSports gambling economy, skins are like casino chips that have monetary value outside the game itself because of the ability to convert them directly into cash.

6.    Diamonds allows users to exchange Skins for diamonds, which then can be used to wager on variable-odds outcomes based on dice rolling. Diamonds claims on its website that it offers an innovative new way to bet Skins and that it caters to all styles of gambling. One diamond is equivalent to approximately $1 in Skins. Diamonds claims that its methods are provably fair and that diamonds earned are able to be converted to real currency. Diamonds can also be used to repurchase Skins, with the price of skins valued according to CS:GO Analysts, which are based on the economic theory of supply and demand. Moreover, Diamonds pays users to promote its website. Diamonds has no age verification process in place, which allows minor users to place illegal bets that can later be converted to real currency on other third-party websites.

7.    Lounge is a third-party site that allows users to place bets on professional Counter-Strike matches. Users simply link their Steam accounts via a sponsored Valve link on Lounge's site. Users can bet up to six Skins on any given match. Users can then collect their winning Skins and sell them for real currency on third-party sites, such as OPSkins, or place additional bets on upcoming professional Counter-Strike matches. Defendant Valve knowingly allows Lounge to provide links to Valve's Steam marketplace. Lounge has no age verification process in place, which allows minor users to place illegal bets.   Valve has an ownership interest in and/or directly profits from the gambling of Skins on Lounge.

8.    OPSkins is a third-party Skins marketplace website that allows a user to link their individual Steam account and sell Skins for real currency. Valve knowingly allowed OPSkins to provide links to Valve's Steam marketplace. OPSKins allows users to get same day cash for their

Skins via PayPal. OPSkins charges a 5% fee for same day cash outs. OPSkins partners with CS:GO Analyst in order to assign value to various Skins. The value of Skins can fluctuate hourly based on the economic theory of supply and demand.

9. In sum, Valve owns the league, sells the casino chips, and receives a piece of the casino's income stream through foreign websites in order to maintain the charade that Valve is not promoting and profiting from online gambling, like a modern-day Captain Renault from Casablanca[7]. That most of the people in the CS:GO gambling economy are teenagers and under 21 makes Valve's and the other Defendants' actions even more unconscionable.

## PARTIES, JURISDICTION AND VENUE

10. Defendant Valve is a Washington Corporation headquartered at 10900 NE 4th St., Suite 500, Bellevue, Washington 98004. Valve is authorized to conduct business and does conduct business throughout the State of Connecticut. Valve is the publisher and developer of the videogame Counter Strike: Global Offensive.

11. Plaintiff Michael John McLeod is a resident and citizen of Fairfield County, Connecticut and a customer of Valve since 2014. He is an on-line player of CS:GO and has entered into wagering as described *infra*. Specifically, Plaintiff purchased CS:GO from Defendant, purchased numerous Skins, gambled them and lost money, and knew that he could cash out the value of the Skins for real money prior to losing them while gambling.

12. This Court also has original jurisdiction over this action pursuant to 28 U.S.C. § 1331 because one of Plaintiff's civil claims arises under the Constitution, laws or treaties of the United States, specifically, violation of 18 U.S.C. § 1962.

---

[7] https://www.youtube.com/watch?v=qmywwiZth5E

13.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367 because the state law claims are so closely related to the claims in which the Court has original jurisdiction that they form part of the same case or controversy.

14.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 as a substantial portion of the events and conduct giving rise to the claims occurred in this District.

## FACTUAL BACKGROUND

### A.     The Rise Of E-Sports and CS:GO

15.     Valve has manufactured video games for nearly 20 years.  In 1999, it introduced the Counter-Strike series, culminating in CS:GO's release in 2012.

16.     CS:GO was one of many similar video games involving players who play as either terrorists or counter-terrorists.  Because the player views the video game through the eyes of a character and shoots guns, it is known as a "first person shooter" game.  When CS:GO was released in 2012, the market was flooded with such franchise as Call of Duty, Halo and Battlefield.

17.     Seeking to differentiate itself, CS:GO introduced Skins.  The announcement made was August 14, 2013 through an announcement posted on its website titled "The Arms Deal Update" ("Skins Announcement").[8]

18.     The Skins Announcement told players that they could "experience all the illicit thrills of black market weapons trafficking without any of the hanging around in darkened warehouses getting knifed to death."  Specifically, "The Arms Deal Update lets you collect, buy, sell and trade over 100 all-new decorated weapons that you can equip in-game."

19.     The Skins Announcement discussed how the new marketplace would work: "You can start collecting decorated weapons via timed weapon drops just by playing CS:GO on

---

[8] http://blog.counter-strike.net/index.php/2013/08/7425/

official and community servers. You can also get them by opening dropped weapon cases with the appropriate key, or by trading with other players through Steam's Trading interface. Additionally, any decorated weapons you've found, bought or traded can be sold on the Steam Marketplace."

20.     Valve directed players to Reddit (the "front page of the internet" forum website with numerous sub-forums for specific interests), the Steam Community Discussions and the CS:GO Forums on steampowered.com for more information and to discuss Skins.

21.     Steam and steampowered.com are wholly owned properties of Valve. For purposes of this Complaint, "Steam" and "Valve" are used interchangeably. Steam operates as a wholly enclosed ecosystem wherein players can play games, communicate with other players, initiate trades with other players, list items for sale, buy games, buy items, deposit money into their "Steam Wallet," participate in forum discussions, and communicate with Valve directly.

22.     When items are bought and sold on the Steam Marketplace, Valve Steam takes a 5% cut on all total sales, and an additional percentage depending on the game the item is related to. If a sale is related to CS:GO, Steam takes an additional 10%, resulting in a 15% fee in all marketplace sales related to CS:GO.

23.     The creation of Skins was a deliberate attempt by Valve to increase its sales and profits by adding an element of gambling to its products. And it worked: as a result of the gambling ecosystem, explained in depth below, that grew up around CS:GO Skins, the number of players on CS:GO increased more than 1,500 percent, and CS:GO became the subject of televised and monetized eSports. Valve has sold more than 21 million copies of CS:GO, earned

more than $567 million in total revenue from sales of CS:GO alone, and earned a percentage of gambling proceeds on CS:GO through various websites and third parties.[9]

24.     This was a deliberate strategy on Valve's part: one of its employees explained at a developer's conference in 2014 that the company determined that the "best way to get players deeply engaged in games…was to give away virtual items of random value and encourage a robust market to trade them."  That employee was quoted as saying: "This is not an accident.  This is by design.  We see more blogs popping up and more and more emails from our players saying, 'I'm not really sure what happened but I've been playing DotA for the last week or two, and I made $100 selling these items that I got.'  This is hugely successful for us."[10]

25.     Valve went so far as to hire an internationally renowned economist to help it develop currencies and cross-platform economies.[11]

26.     The results were stunning: in addition to TBS broadcasting video games on television, eSports matches have sold out arenas, are watched by tens of millions of viewers online and created a multi-billion dollar global gambling marketplace.

27.     All of this is illegal in the United States.

28.     Valve has no license, permission or legal authority to create an online gambling platform, and, as discussed more in depth below, Valve's affirmative actions both created this online gambling system and allow it to continue.

B.      **The Mechanics of Gambling On CS:GO**

29.     Valve sells Skins through its website and Steam platform.  These Skins can be won, bought, trade, sold, and otherwise have in-game value through Steam's marketplace and the

---

[9] http://www.bloomberg.com/features/2016-virtual-guns-counterstrike-gambling/
[10] http://www.bloomberg.com/features/2016-virtual-guns-counterstrike-gambling/
[11] http://www.bloomberg.com/features/2016-virtual-guns-counterstrike-gambling/

CS:GO game itself.  It also sells higher-priced versions of Skins called Knives using the same system.[12]

30.     Unlike apps and other computer games with such in-game purchases, Valve has created and currently supports a secondary marketplace where these in-game purchases can be gambled and cashed out.

31.     Skins, in gambling terms, can be seen as casino chips.

32.     CS:GO matches happen all day every day, and at any given time there are as many as 380,000 people playing CS:GO online.[13]

33.     In addition to the TBS-televised games, there are online broadcasts on websites such as Twitch.  In any given match, viewers may pick which team they think is going to win. The people who bet on the outcome of the eSports match do not play in it and have no control over the outcome.

34.      "People buy skins for cash, then use the skins to place online bets on pro CS:GO matches.  Because there's a liquid market to convert each gun or knife back into cash, laying a bet in skins is essentially the same as betting with real money."[14]

35.     Players can link their Steam account to third party websites such as Diamonds, Lounge and OPSkins.

36.     These third party websites require permission and cooperation from Valve in order to access a player's account on Steam, and Valve specifically allows players to transfer skins to third-party sights. Valve allows this knowing exactly what these sites are, what users are doing, and is affirmatively supporting these sites and receiving income from transactions on

---

[12] http://www.pcgamer.com/how-400-virtual-knives-saved-counter-strike/2/
[13] http://www.bloomberg.com/features/2016-virtual-guns-counterstrike-gambling/
[14] http://www.bloomberg.com/features/2016-virtual-guns-counterstrike-gambling/

these sites. "The gambling sites run on software built by Valve, and whenever CS:GO skins are sold, the game maker collects 15 percent of the money."[15]

37.     Upon information and belief, Valve has an ownership interest, partnership or otherwise a direct business relationship with Lounge.

38.     Some gambling sites, such as Diamonds, don't even require players to wager on the outcome of eSports matches, and simply operate roulette-style games where people risk Skins to win more Skins based on the roll of the dice or the outcome of random number generators[16]:



[15] http://www.bloomberg.com/features/2016-virtual-guns-counterstrike-gambling/
[16] http://csgodiamonds.com/#/

39.     As the above screenshot shows, the STEAM logo is prominently displayed and users must login through STEAM to access and bet their Skins.

40.     Valve employees communicate directly with Lounge and provide technical support to the website, according to a Lounge employee and spokesperson.[17] The Valve logo is displayed prominently on the website and users must login to their Steam account to wager on matches on Lounge[18]:



41.     In a post on Valve's forum, a moderator — that is, a Valve spokesperson who manages the forums on behalf of Valve — told "younger" users who think they have been scammed through third party sites such as Lounge to not post on the forums about it.  Rather,

[17] http://www.bloomberg.com/features/2016-virtual-guns-counterstrike-gambling/
[18] https://csgolounge.com/

those "younger" users who were scammed on a third-party gambling site should contact Valve directly.[19] In this post, the moderator on Steam's own forums told users, including its "younger" users: "Safe betting and trading!"[20]

42.     Despite these connections, Lounge claims on its website that it is not affiliated with Steam or Valve:



43.     The above screenshot shows where users are taken when they attempt to place a bet on a match on Lounge - they must login to their Steam account through Steam/Valve's website.

---

[19] http://www.bloomberg.com/features/2016-virtual-guns-counterstrike-gambling/
[20] http://steamcommunity.com/groups/csgolounge/discussions/8/627456486705186974/

44.     Lounge acts more as a sports book or pool betting system: it takes bets on each side of matches and takes a fee from the transaction, which it then shares with Valve.

45.     Finally, once users have accumulated Skins or Knives in their Steam accounts through third-party gambling sites, they can convert them to cash through OPSkins.

46.     OPSkins, based in Canada, links directly to a user's Steam account as well[21]:



[21] https://opskins.com/;
https://steamcommunity.com/openid/login?openid.ns=http%3A%2F%2Fspecs.openid.net%2Fauth%2F2.0&openid.mode=checkid_setup&openid.return_to=https%3A%2F%2Fopskins.com%2Findex.php&openid.realm=https%3A%2F%2Fopskins.com&openid.identity=http%3A%2F%2Fspecs.openid.net%2Fauth%2F2.0%2Fidentifier_select&openid.claimed_id=http%3A%2F%2Fspecs.openid.net%2Fauth%2F2.0%2Fidentifier_select



47.     Users on OPSkins can cash out their Skins for real money through their PayPal accounts.

48.     Thus, users deposit real money on Valve's website, connect that real money account to nominally third-party websites with direct connections to Valve where users can participate in various forms of gambling, and then cash out their account balances, converting Skins into real money through PayPal.

49.     This is an illegal scheme designed to bypass state-by-state gambling laws.

**C.      How Unregulated Gambling Harms Consumers**

50.     Because Valve has helped to create an unregulated, international gambling concern with no oversight that targets teenagers, Plaintiffs and the class have been damaged.

51.     This unregulated market is ripe for scams, cheating, fraud and other harms to users.  For instance, there have been numerous instances of match-fixing in CS:GO matches. For

instance, in January 2015, it became clear that a highly qualified team of CS:GO players fixed matches against lesser teams.[22]

52.     In 2016, "reports of a particularly high-profile incident reached Valve, and the company contacted CSGO Lounge to help identify the culprits….  In the end, Valve banned seven players from events it sponsors, and forbade professional players and team staff from gambling on matches, associating with high-volume gamblers, or sharing inside information."[23]

53.     In June 2016, Diamonds admitted it was providing a sponsored player with advance notice when he would win spins on its site, so that the user would record himself playing and winning, post this video to YouTube and social media sites, and generate excitement and new users for Diamonds' website.[24]

## CLASS ALLEGATIONS

54.     A class action is the proper form to bring Plaintiffs' claims under FRCP 23. The potential Class is so large that joinder of all members would be impracticable. Additionally, there are questions of law or fact common to the Class, the claims or defenses of the representative parties are typical of the claims or defenses of the Class, and the representative parties will fairly and adequately protect the interests of the Class.

55.     This action satisfies all of the requirements of FRCP, including numerosity, commonality, typicality, adequacy, predominance and superiority.

56.     **Numerosity**: the Class is so numerous that joinder of all members is impracticable.  While the exact number is not known at this time, it is generally ascertainable by

---

[22] http://www.dailydot.com/esports/match-fixing-counter-strike-ibuypower-netcode-guides/
[23]  http://www.bloomberg.com/features/2016-virtual-guns-counterstrike-gambling/
[24] http://www.esportsbettingreport.com/csgo-diamonds-skin-betting-m0e/;
http://www.twitlonger.com/show/n_1sopll1

appropriate discovery. News accounts discuss how millions of users compete on the websites of Defendant and its unnamed co-conspirators.

57.     **Commonality:** the claims made by Plaintiff meet the commonality requirement because they present shared questions of law and fact, and resolving these questions will resolve the classwide litigation. These shared questions predominate over individual questions, and they include, without limitation:

- a. Whether Plaintiff and members of the Class entered into contracts with Defendant over the past four years;
- b. Whether such contracts are *per se* void, pursuant to Connecticut law;
- c. Whether such contracts are void pursuant to Connecticut civil law;
- d. Whether the Terms of Use are unconscionable, illusory, fraudulent, or otherwise invalid;
- e. Whether Plaintiff and members of the Class paid monies to Defendant in consideration of those contracts;
- f. Whether Defendant's operations and third-party websites Defendant supports are a game of chance under all applicable laws and rules;
- g. Whether Defendant's operations violate Connecticut law;
- h. Whether Plaintiff and members of the Class are entitled to restitution and entitled to recovery of lost wagers from Valve or the disgorgement of profits from Valve's profits in illegal gambling;
- i. Whether Defendant acted in concert with other CSGO gambling sites to condone, allow, or promote the practice of betting and gambling through the use of CSGO items;
- j. Whether Defendant was negligent or otherwise acted wrongfully in allowing and encouraging users to utilize its service to bet and gamble on CSGO games;
- k. Whether Defendant owed duties to the Plaintiff and the proposed Class members, the scope of those duties, and if they breached those duties;
- l. Whether consumers such as the Plaintiff and the proposed Class members were harmed by Defendant's actions, as described in detail above;
- m. The extent of the damages caused by the Defendant's acts; and
- n. Whether Defendant violated Connecticut state consumer protection statutes, as well as the consumer protection statutes of other states.

58.     **Typicality**: Plaintiffs' claims are typical of those of the other Class members because Plaintiffs, like every other Class member, was induced to use Defendant's sites based on false and misleading advertisements of fair play, and lack of information about having to compete against players with inside information.

15

59.     The claims of the Class Representative Plaintiff are furthermore typical of other Class members because they make the same claims as other class members. Plaintiff has an interest in seeking compensation from Defendant.

60.     **Adequacy**: Plaintiff will fairly and adequately represent and protect the interests of the Class in that he has no disabling conflicts of interest that would be antagonistic to those of the other members of the Class. Plaintiff seeks no relief that is antagonistic or adverse to the members of the Class and the infringement of the rights and the damages he has suffered are typical of other Class members.

61.     **Superiority:** The class litigation is an appropriate method for fair and efficient adjudication of the claims involved. Class action treatment is superior to all other available methods for the fair and efficient adjudication of the controversy alleged herein; it will permit a large number of class members to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort and expense that hundreds of individual actions would require. Class action treatment will permit the adjudication of relatively modest claims by certain class members, who could not individually afford to litigate a complex claim against large corporate defendants. Further, even for those class members who could afford to litigate such a claim, it would still be economically impractical.

62.     The nature of this action and the nature of Connecticut and federal laws available to Plaintiff and the Class makes the use of the class action device a particularly efficient and appropriate procedure to afford relief to Plaintiff and the Class for the wrongs alleged. Without the class action mechanism, Defendant would necessarily gain an unconscionable advantage since it would be able to exploit and overwhelm the limited resources of each individual Class

member with superior financial and legal resources; and the costs of individual suits could unreasonably consume the amounts that would be recovered. Likewise, proof of a common course of conduct to which Plaintiff was exposed is representative of that experienced by the Class, and will establish the right of each member of the Class to recover on the cause of action alleged; and Individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

63.     The proposed Class is described as follows:

> **"All persons in the United States who deposited money into any account with Defendant and its unnamed co-conspirators and wagered on the outcome of CS:GO games"**

64.     Plaintiff reserves the right to modify or amend the definition of the proposed class and to modify, amend or remove proposed subclasses, before the Court determines whether certification is appropriate and as the parties engage in discovery.

65.     Plaintiff will fairly and adequately protect the interests of the Class. The interests of the class representative are consistent with those of the other members of the Class. In addition, Plaintiff is represented by experienced and able counsel who have expertise in the areas of tort law, trial practice, and class action representation.

66.     The class action is superior to all other available methods for the fair and efficient adjudication of this controversy. Because of the number and nature of common questions of fact and law, multiple separate lawsuits would not serve the interest of judicial economy.

67.     Excluded from the Class are:
   a.     Defendant and any entities in which Defendant has a controlling interest;
   b.     Any entities in which Defendant's officers, directors, or employees are employed and any of the legal representatives, heirs, successors, or assigns of Defendant;
   c.     The Judge to whom this case is assigned and any member of the Judge's immediate family and any other judicial officer assigned to this case;

     d.      All persons or entities that properly execute and timely file a request for exclusion from the Class;

     e.      Any attorneys representing the Plaintiff or the Class.

## COUNT I
## RESTITUTION PURSUANT TO CT GEN. STAT. SECTION 52-553, et seq.

68.     Plaintiff, on behalf of himself and the proposed Class, repeats and realleges all preceding paragraphs as if fully set forth herein.

69.     Connecticut General Statutes Section 53-278(a), et seq., defines gambling in a manner that encompasses the activities by Valve, Lounge, OPSkins and Diamonds.

70.     Section 52-553 renders all contracts for gambling null and void.

71.     Section 52-554 allows any person, such as Plaintiff, who lost money pursuant to any illegal contract to recover such losses.

72.     Plaintiff and members of the Class entered into contracts with Lounge, Diamonds, Valve, and OPSkins that are void. Specifically, Plaintiff created a Steam account in 2014 and entered into transactions with Defendant in which he purchased Skins. He then gambled the Skins, frequently betting Skins worth $5 each and losing their equivalent cash value.

73.     Plaintiff purchased and gambled Skins as a minor, and later as an adult.

74.     Plaintiff and members of the Class paid monies in consideration of these contracts that are void.

75.     Accordingly, Plaintiff and members of the Class are entitled to damages in the form of restitution for monies paid in connection with these void contracts over the course of the past four (4) years.

## COUNT II
## UNJUST ENRICHMENT

76.     Plaintiff, on behalf of himself and the proposed Class, repeats and realleges all proceeding paragraphs as if fully set forth herein.

77.     Plaintiff and members of the proposed Class conferred a benefit on Defendant by purchasing CS:GO, depositing money, purchasing in-game items, and playing in contests on various websites with which Valve had a financial relationship.

78.     Defendant has further benefited from monetarily from unlawful and/or illegal conduct directed to its customers in Connecticut, including from Plaintiff and members of the class.

79.     Defendant's benefit came at the expense and detriment of Plaintiff and Class members..

80.     Defendant has thus unjustly enriched itself in retaining the revenues derived from enforcement of illegal contracts, deposits, wagers, purchases and gambling by Plaintiff and the members of the proposed class, which retention under these circumstances is unjust and inequitable because Defendant entered into or caused to be created illegal, voidable, and unconscionable gambling contracts with Plaintiff and other members of the proposed class, and has created an illegal international gambling economy operating in the United States and targeted at teenagers.

81.     Defendant has benefited from its creation of an illegal gambling scheme through the creation of Skins and the assistance provided to international companies that provide ways to gamble Skins and convert in-game Skins with no cash value into cash value.

82.     Plaintiff and members of the proposed class were injured as a direct and proximate result of Defendant's illegal activities because they paid for items and wagers that

were unregulated, illegal gambling activities ripe for fraud, abuse and theft, and with no way of knowing whether they were fairly run.

83. Because Defendant's retention of the non-gratuitous benefit conferred on it by Plaintiff and the members of the proposed class is unjust and inequitable, Defendants must pay restitution to Plaintiff and the members of the proposed class for its unjust enrichment, as ordered by the Court.

84. Equity and good conscience require that Defendant disgorge its profits made thereby, and Plaintiff and members of the class further seek restitution on this basis.

**COUNT III**
**VIOLATION OF 18 U.S.C. § 1962**

85. Plaintiff, on behalf of himself and the proposed class, repeats and realleges all preceding paragraphs as if fully set forth herein.

86. Diamonds, Lounge, Valve, and OPSkins are all "persons" under 18 U.S.C. § 1961(3).

87. Valve, Diamonds, Lounge and OPSkins's illegal gambling businesses involve five or more persons who conduct, finance, manage, supervise, direct and/or own all or part of Valve, Lounge, OPSkins and Diamonds, within the meaning of 18 U.S.C. § 1955.

88. Pursuant to 18 U.S.C. § 1962:

> It shall be unlawful for any person who has received any income derived, directly or indirectly, form a pattern of racketeering activity or through collection of an unlawful debt… to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

89. Valve and the other non-defendant third-parties identified above in Paragraph 5 named in this count violated 18 U.S.C. § 1962(c) by participating in, facilitating, or conducting

the affairs of the Valve, Lounge, OPSkins and/or Diamonds RICO Enterprise through a pattern of racketeering activity.

90.     Valve, OPSkins, Lounge and CSGO Diamonds are operating illegal online gambling websites within Connecticut. Lounge, OPSkins and Diamonds all depend on Valve to operate their businesses to facilitate gambling, trades of items, as well as item sales. These entities also rely on a third-party market, like the one hosted by OPSkins and other websites, in order to provide a way for gamblers to cash out their in-game items for cash value, to process these payments, and to set the real world valuation for these items.

91.     Lounge, Diamonds, OPSkins and Valve are the ringleaders of their respective illegal gambling enterprises, as set forth herein.

92.     Independently and collectively, Valve is responsible for facilitating the growth of the illegal internet gambling enterprises, such as those operated by Lounge, OPSkins and Diamonds, that blossomed into billion dollar business because they created and provided legitimacy and support for what is, in fact, an illegal gambling activity.

93.     Valve provided money, technical support, and advice for Lounge, Diamonds and OPSkins, providing legitimacy to the illegal gambling that was occurring, continues to occur, and by permitting Lounge, Diamonds and OPSkins to use their logo and infrastructure to attract more bettors.

94.     Plaintiff placed bets on multiple contests through Lounge and Diamonds. The wagers allow these sites to operate and profit. The bets were facilitated by Valve, and Valve permits users to buy and sell the winnings of such bets on OPSkins.

95.     Valve has a direct interest in the operation of OPSkins, Lounge and Diamonds because Valve profits directly and indirectly through the online gambling websites.

96.     Valve's processing of transactions facilitated by Lounge, OPSkins and Diamonds illegal gambling scheme, implicates Valve and OPSkins into Lounge's and Diamonds' gambling scheme by directing, conducting, guiding, and participating, directly or indirectly, in the conduct of an enterprise through a pattern of racketeering activity and/or collection of an unlawful debt.

97.     As a result of Defendant's actions, Plaintiff has suffered financial losses.

98.     Plaintiff and class members are "person[s] injured in his or her business or property" by reason of Lounge's, Diamond's, OPSkins's and Valve's violation of RICO within the meaning of 18 U.S.C. § 1964(c).

99.     The acts alleged herein occurred more than three times and on a daily bases.

100.    Pursuant to 18 U.S.C. § 1964, Plaintiff is entitled to recover treble damages, costs and attorneys' fees for his damages proximately caused by Defendant's RICO enterprise.

**A.     Predicate Act – Violation of 18 U.S.C. § 1955**

101.    Independently and collectively, Valve and the unnamed co-conspirators in this Count are responsible for the growth of the illegal enterprise to become a multi-billion dollar business by providing legitimacy to what was, in fact, an illegal activity. The mere act of allowing Plaintiff, and other members of the Class, to sign into Steam through Lounge, OPSkins and Diamonds bolstered the credibility of the illegal enterprises in the eyes of unsuspecting bettors.

102.    Valve and the unnamed co-conspirators all committed a Predicate Act under RICO, violation 18 U.S.C. § 1955, which provides in relevant part:

(a) Whoever conducts, finances, manages, supervises, directs, or owns all or part of an illegal gambling business shall be fined under this title or imprisoned not more than five years, or both.
(b) As used in this section—
    i. "Illegal gambling business" means a gambling business which—is a violation of the law of a State or political subdivision in which it is conducted; involves

five or more persons who conduct, finance, manage, supervise, direct, or own all or part of such business; and has been or remains in substantially continuous operation for a period in excess of thirty days or has a gross revenue of $2,000 in any single day.

**

(4) "gambling" includes but is not limited to pool-selling, bookmaking, maintaining slot machines, roulette wheels or dice tables, and conducting lotteries, policy, bolita or numbers games, or selling chances therein.

**

(6) "State" means any State of the United States, the District of Columbia, the Commonwealth of Puerto Rico, and any territory or possession of the United States.

103. Valve, Lounge, OPSkins and Diamonds are illegal gambling businesses because they meet all three elements of 18 U.S.C. § 1955(b)(1-3).

104. Valve, Lounge, OpSkins and Diamonds are each "illegal gambling business" within the meaning of 18 U.S.C. § 1955(b)(1), because, as set forth herein, each of their activities violate all state laws and at a minimum, Connecticut. "State" means any State of the United States. 18 U.S.C. § 1955(b)(6).

105. Valve, Lounge, OpSkins and Diamonds are each an "illegal gambling business" within the meaning of 18 U.S.C. § 1955(b)(2), because each respective business involves five or more persons who conduct, finance, manage, supervise, direct, or own all or part of the business.

106. Valve, Lounge, OpSkins and Diamonds are each an "illegal gambling business" within the meaning of 18 U.S.C. § 1955(b)(3), because each have been or remain in substantially continuous operation since at least January 1, 2013, for a period in excess of thirty days or has a gross revenue of $2,000 in any single day.

**B.    The Online Gambling RICO Enterprises**

107. The following persons, and others presently unknown, have been members of and constitute an "association-in-fact enterprise" within the meaning of RICO₁:

108. **Lounge**, who: 1) created an illegal gambling enterprise; 2) knowingly created and conducted illegal gambling activities in violation of all state laws and at a minimum, Connecticut

in return for payment of items of value, including significant sums of money; 3) conducted, directed, managed, supervised, directed and owned an illegal gambling business in violation of 18 U.S.C. § 1955.

109.    **Diamonds**, who: 1) created an illegal gambling enterprise; 2) knowingly created and conducted illegal gambling activities in violation of all state laws and at a minimum, Connecticut in return for payment of items of value, including significant sums of money; 3) conducted, directed, managed, supervised, directed and owned an illegal gambling business in violation of 18 U.S.C. § 1955.

110.    **Valve**, who: 1) knowingly facilitated the transactions required to conduct the illegal gambling operations of CSGO Lounge and CSGO Diamonds; 2) provided technical support and know-how to CSGO Lounge and CSGO Diamonds to permit them to link their own database of users with Steam users. By virtue of this support, implicit promotion and endorsement of Defendant's illegal internet gambling enterprises, Valve thereby gave credibility and legitimacy to these defendants and thus attracted more players to participate as customers in an illegal gambling enterprise.

111.    **OPSkins**, who: 1) knowingly facilitated transactions of users buying, selling, and general cashing-out of items users gained through participation on CSGO Lounge and CSGO Diamonds illegal gambling enterprises. This support entices and attracts users of all ages to participate on defendants gambling websites so that they might win more valuable items in the hopes of being able to turn an in-game currency into real money.

112.    Lounge and Diamonds, each of which engaged in, and whose activities affected interstate and foreign commerce, is an association-in-fact of individuals and corporate entities within the meaning of 18 U.S.C. § 1961(4) and consists of "persons" associated together for a

common purpose. Each RICO enterprise had an ongoing organization with an ascertainable structure, and functioned as a continuing unit with separate roles and responsibilities.

113. Valve, Lounge, OpSkins and Diamonds each participated in the RICO enterprise, but also had an existence separate and distinct from the enterprise.

114. At all relevant times, Valve, Lounge, OpSkins and Diamonds operated, controlled, or managed their respective CSGO gambling services through a variety of actions.

115. Valve, Lounge, OpSkins and Diamonds participation in the RICO enterprise was necessary for the successful operation of its scheme to conduct an illegal gambling enterprise, both companies controlled and monitored all aspects of eGaming betting and gambling on its respective website and concealed the nature and scope of the illegal gambling enterprise and profited from such concealment.

116. The members of the gambling enterprise served a common purpose: to maximize profits on their respective illegal gambling sites and to collect as many rare in-games item as possible in order to profit from the resale of these items on the third-party market through the use of user fees and bets.

**C.     The Pattern of Racketeering Activity**

117. Valve, Lounge, OpSkins and Diamonds conducted and participated in the conduct and the affairs of their respective Online Gambling Enterprises through a pattern of illegal internet gambling pursuant to violations of 18 U.S.C. §1955 thereby constituting racketeering activity that has lasted for several years beginning no later than January 1 2013 and continuing to this day, and that consisted of numerous and repeated violations of 18 U.S.C. §1955, mail and wire fraud statutes, which prohibit the use of any interstate or foreign mail or wire facility for the purpose of executing a scheme to defraud, in violation of 18 U.S.C. §§ 1341 and 1343.

118. The purpose of Valve, Lounge, OpSkins and Diamonds and the scheme to violate 18 U.S.C. § 1955 was to profit through illegal internet gambling.

119. By concealing the scope and nature of each illegal gambling enterprise, Valve, Lounge, OpSkins and Diamonds also maintained and boosted consumer confidence in their respective illegal internet gambling enterprises, their brands, and e-sports betting, all of which furthered their schemes to defraud and helped both Valve, Lounge, OpSkins and Diamonds generate more users to play their bet and gamble on their respective sites.

120. As detailed in this Complaint, Valve, Lounge, OpSkins and Diamonds were well aware that its enterprise constituted illegal internet gambling under federal and individual United States law. Nonetheless, they used money generated from innocent bettors to intentionally subject Plaintiff and Class Members to those risks or consciously disregarded those risks in order to maximize their profits at the expense of Plaintiffs and Class Members.

121. To carry out, or attempt to carry out the scheme to defraud, Valve, Lounge, OpSkins and Diamonds each individually conducted or participated in the conduct of the affairs of their respective RICO Enterprises through the following pattern of racketeering activity that violated 18 U.S.C. § 1955 and employed the use of the mail and wire facilities, in violation of 18 U.S.C. § 1341 (mail fraud) and § 1343 (wire fraud):

   a. Valve, Lounge, OpSkins and Diamonds devised and furthered their own schemes to defraud by use of the mail, telephone, and internet, and transmitted, or caused to be transmitted, by means of mail and wire communication travelling in interstate or foreign commerce, user fees and illegal gambling proceeds, writing(s) and/or signal(s), including their respective websites, statements to the press, and communications with other members of their respective RICO

Enterprises, as well as the user fees and transactional costs of the illegal internet gambling activities, advertisements and other communications to the Plaintiffs and Class Members; and

b. Valve, Lounge, OpSkins and Diamonds each individually utilized the interstate and international mail and wires for the purpose of obtaining money or property by means of the omissions, false pretense, and misrepresentations described herein.

122. The Defendants separate pattern of racketeering activity in violation of 18 U.S.C. § 1955 and the use of the mail and wire fraud statutes included but was not limited to the following:

a. Knowingly conducting illegal gambling activities that violated, at a minimum, the laws of the state Connecticut and thereby also violating 18 U.S.C. §1955, a RICO predicate act;

b. By transmitting, causing to be transmitted, by means of mail and wire communication and the internet, by travelling in interstate or foreign commerce, between their offices in Connecticut and various other locations across the United States, communications concealing the illegality of their schemes on their betting websites on a nationwide basis.

123. The conduct of Valve, Lounge, OpSkins and Diamonds in furtherance of their respective illegal activities and gaming was intentional. Plaintiff and Class members were directly harmed as a result of Defendant's conduct.

124. As set forth herein Valve, Lounge, OpSkins and Diamonds engaged in patterns of related and continuous predicate acts since at least August 1, 2013. The predicate acts constituted

a variety of unlawful activities with each conducted with the common goal of defrauding Plaintiff and other Class members and obtaining significant monies and revenues from them while providing an illegal betting website. These predicate acts were related and not isolated events. Further, the predicate acts also had the same or similar results, participants, victims, and methods of commission.

125. Because of Valve, Lounge, OpSkins and Diamonds's pattern of racketeering activity, Plaintiff and Class members have been injured in their business and/or property in multiple ways, including but not limited to the loss of their items, wagers, and fees lost when wagering and betting.

126. The violations by Valve, Lounge, OpSkins and Diamonds of 18 U.S.C. § 1955 and 18 U.S.C.§ 1962(c) have directly and proximately caused injuries and damages to Plaintiff and Class members in the form of their losses while betting on defendants' illegal gambling websites. As such, Plaintiff and Class members are entitled to bring this class action for three times their actual damages, as well as injunctive and equitable relief and costs and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c).

127. As a result of the actions of Valve, Lounge, OpSkins and Diamonds, Plaintiff has suffered losses in an amount to be determined at trial,.

## COUNT IV
## VIOLATIONS OF THE CONNECTICUT UNFAIR TRADE PRACTICES ACT
## CONN. GEN. STAT. § 42-110A, ET. SEQ.

128. Plaintiff repeats, realleges, and incorporates by reference each of the foregoing allegations as though fully set forth herein.

129. At all relevant times hereto, the Defendant was prohibited by Section 42-110(b) of the Connecticut General Statutes from engaging in unfair deceptive acts or practices in the

conduct of their business in the State of Connecticut. The actions of the Defendant constitute a

violation of the Connecticut Unfair Trade Practices Act, Conn. Gen. Stats. Section 42-110a, *et

seq.,*in that such actions were immoral, unethical, oppressive, unscrupulous, offend public policy,

and caused substantial injury to consumers, including Plaintiff and Class members, and were

done with reckless indifference to the rights of the Plaintiff and Connecticut Class members.

130.    The actions of the Defendant as described in this complaint caused the Plaintiff

and class members to suffer actual and ascertainable injuries, damages, loss of money and

property.

131.    Pursuant to Section 42-110g(c) of the Connecticut General Statutes, a copy of this

complaint has been mailed to the Attorney General and the Commissioner of Consumer

Protection of the State of Connecticut.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff and members of the proposed class pray for relief and judgment

against Defendant, as follows:

a.      For an order certifying the proposed classes, appointing Plaintiff and their counsel to represent the proposed class and notice to the proposed classes to be paid by Defendant;

b.      For damages suffered by Plaintiff and members of the proposed class;

c.      For restitution to Plaintiff and the proposed class of all monies wrongfully obtained by Defendant;

d.      For injunctive relief requiring Defendant to cease and desist from engaging in the unlawful, unfair, and/or deceptive practices alleged in the Complaint;

e.      An order awarding declaratory relief, retrospective and prospective injunctive relief as permitted by law or equity, including enjoining

Defendant from continuing the unlawful practices as set forth herein, and injunctive relief to remedy Defendant's past conduct;

f.    For Plaintiff's reasonable attorneys' fees, as permitted by law;

g.    For Plaintiff's costs incurred;

h.    For pre-judgment and post-judgment interest at the maximum allowable rate on any amounts awarded; and

i.    For such other and further relief that this Court deems just and proper under equity or law, including the award of punitive damages.

## JURY DEMAND

Plaintiff demands a trial by jury on all counts so triable.


Dated: June 23, 2016      By: /s/      Neal L. Moskow

                                    Neal L. Moskow, Esq.
                                    Fed. Bar. No. CT 04516
                                    Ury & Moskow, L.L.C.
                                    883 Black Rock Turnpike
                                    Fairfield, CT 06825
                                    Telephone (203) 610-6393
                                    Facsimile: (203) 610-6399
                                    neal@urymoskow.com

                                    Paul C. Whalen (PW1300)
                                    LAW OFFICE OF PAUL C. WHALEN, P.C.
                                    768 Plandome Road
                                    Manhasset, NY 11030
                                    (516) 426-6870 telephone
                                    (212) 658-9685 facsimile
                                    pcwhalen@gmail.com

                                    Jasper D. Ward IV
                                    Alex C. Davis
                                    Patrick Walsh
                                    JONES WARD PLC
                                    Marion E. Taylor Building
                                    312 S. Fourth Street, Sixth Floor
                                    Louisville, Kentucky 40202
                                    Tel. (502) 882-6000
                                    Fax (502) 587-2007
                                    jasper@jonesward.com
                                    alex@jonesward.com
                                    patrick@jonesward.com

                                    *Counsel for Plaintiff and the Proposed Class*