## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| **Michael John McLeod**, et al. Individually And On Behalf of All Others Similarly Situated,<br><br>                                          **PLAINTIFFS**,<br><br>**vs.**<br><br>**VALVE CORPORATION** a Washington corporation,<br><br>                                          **DEFENDANT** | <br><br><br><br>**CASE NO.  3:16-cv-01018-AWT**<br><br>**JURY TRIAL DEMANDED** |

## FIRST AMENDED CLASS ACTION COMPLAINT

Plaintiff Michael John McLeod ("Plaintiff"), individually, and on behalf of all others similarly situated, by and through counsel, brings this action against Valve Corporation, and states as follows:

## NATURE OF THE CASE

1.      Competitive video gaming is a multi-billion dollar business.  The industry is similar to other major sports like football, basketball and baseball, and is generally called eSports.  And just like major sports, eSports has its own professional players, organized leagues and even weekly nationally televised contests on the cable station TBS[1], all sponsored by major corporate advertising with national brands like Buffalo Wild Wings and Arby's.[2]

2.      Just like traditional sports, eSports has become the subject of gambling and wagering on outcomes of matches between professional teams.  An estimated $2.3 billion was wagered on eSports in 2015 by more than 3 million people.[3]  Like traditional sports, the vast

---

[1] http://www.e-league.com/teams/
[2] http://www.e-league.com/news/official-marketing-partners
[3] http://www.bloomberg.com/features/2016-virtual-guns-counterstrike-gambling/

majority of this wagering takes place through an unregulated economy on websites mostly based outside of the United States.  However, unlike traditional sports, the people gambling on eSports are mostly teenagers.[4]  Also unlike traditional sports, the company that makes the product being wagered on is directly profiting from that wagering.[5]

3.      Defendant Valve Corporation ("Valve"), headquartered in Bellevue, Washington, owns the sports league product and is a key component in the online gaming marketplace through its Steam platform.  Valve has knowingly allowed an illegal online gambling market and has been complicit in creating, sustaining and facilitating that market.  Throughout this Amended Complaint, Steam and Valve are used interchangeably.

4.      Valve does this through its e-gaming phenomenon product Counter-Strike: Global Offensive ("CS:GO" or "Counter-Strike"). More than 380,000 people are playing Counter-Strike worldwide at any given time.[6] CS:GO is the subject of TBS weekly e-gaming matches, and is the main driver of the pro-gaming cultural phenomenon. CS:GO matches are streamed live on websites like Twitch in addition to the TBS weekly league show.

5.      Defendant Valve knowingly allowed, supported, and/or sponsored illegal gambling by allowing millions of Americans to link their individual Steam accounts to third-party websites such as CSGO Lounge ("Lounge"), CSGO Diamonds ("Diamonds"), CSGOSpeed ("Speed"), CSGOCrash ("Crash"), Skin Arena ("Arena") and OPSkins (collectively, "unnamed co-conspirators") and by allowing third party sites to operate their gambling transactions within the Steam marketplace.  Lounge, Diamonds, Speed, Crash and Arena are collectively referred to as "Skins Gambling Websites" hereafter.

---

[4] http://www.bloomberg.com/features/2016-virtual-guns-counterstrike-gambling/
[5] http://www.bloomberg.com/features/2016-virtual-guns-counterstrike-gambling/
[6] http://www.bloomberg.com/features/2016-virtual-guns-counterstrike-gambling/

6.     Counter-Strike players can purchase CS:GO Skins ("Skins"), weapons with different textures that can be used during gameplay of Counter-Strike, through Steam, Valve's online marketplace. Skins can then easily be traded and used as collateral for bets placed on Skins Gambling Websites through linked Steam accounts. In the eSports gambling economy, skins are like casino chips that have monetary value outside the game itself because of the ability to convert them directly into cash.  Valve takes a 15% fee on the sale of each Skin (casino chip) through its marketplace.[7]

7.     Unlike traditional casino chips, however, Valve has created Skins out of thin air and can therefore control the ultimate real world value of these items through its control over supply in the marketplace.[8]  And, unlike a traditional casino, Valve does not risk anything by selling these Skins and does not allow users to directly exchange these for cash, and only makes a fee from selling them.

8.     Diamonds allows users to exchange Skins for virtual diamonds, which then can be used to wager on variable-odds outcomes based on dice rolling. Diamonds claims on its website that it offers an innovative new way to bet Skins and that it caters to all styles of gambling. One diamond is equivalent to approximately $1 in Skins. Diamonds claims that its methods are provably fair and that diamonds earned are able to be converted to real currency. Diamonds can also be used to repurchase Skins, with the price of skins valued according to CS:GO Analysts, which are based on the economic theory of supply and demand. Moreover, Diamonds pays users to promote its website. Diamonds has no age verification process in place, which allows minor users to place illegal bets that can later be converted to real currency on other third-party websites.

---

[7] https://support.steampowered.com/kb_article.php?ref=6088-UDXM-7214
[8] http://store.steampowered.com/news/19618/

9.     Lounge is a third-party site that allows users to place bets on professional Counter-Strike matches. Users simply link their Steam accounts via a sponsored Valve link on Lounge's site. Users can bet up to six Skins on any given match. Users can then collect their winning Skins and sell them for real currency on third-party sites, such as OPSkins, or place additional bets on upcoming professional Counter-Strike matches. Defendant Valve knowingly allows Lounge to provide links to Valve's Steam marketplace.  Valve knowingly allows and facilitates Lounge having multiple accounts on the Valve Marketplace to facilitate the gambling transactions, and provides support and easy access for Lounge to create and manage these accounts.  Valve knows Lounge is operating a skins gambling website.  Lounge has no age verification process in place, which allows minor users to place illegal bets.   Upon information and belief, Valve has an ownership interest in and/or directly profits from the gambling of Skins on Lounge.

10.     Speed, Crash, and Arena are third-party site that allow users to place bets on various casino-style games, lotteries, jackpots, and other ways to gamble skins as if they were casino chips, sometimes against the site itself, and sometimes against other players.  Users have to login to each of these accounts through their Steam account, trade their skins to the site's own steam accounts or steam account bots on the Steam Marketplace, and then receive skins back through the Steam Marketplace.  Defendant Valve knowingly allows Speed, Crash and Arena to have accounts on Steam's Marketplace, use Steam's software to login to users' Steam accounts, access information on Steam's servers, and provide links to Steam's marketplace.  Valve knows these websites are used for gambling of items with real world cash value and affirmatively allows this gambling.

4

11.     OPSkins is a third-party Skins marketplace website that allows a user to link their individual Steam account and sell Skins for real currency. Valve knowingly allowed OPSkins to provide links to Valve's Steam marketplace and allows OPSkins to have multiple accounts on the Steam Marketplace to facilitate the cashing out of Skins for real money, and provides support and easy access for OPSkins to create and manage these accounts.  Valve knows OPSkins is operating a skins gambling and cash marketplace website. OPSKins allows users to get same day cash for their Skins via PayPal. OPSkins charges a 5% fee for same day cash outs. OPSkins partners with CS:GO Analyst in order to assign value to various Skins. The value of Skins can fluctuate hourly based on the economic theory of supply and demand.

12.     In sum, Valve owns the league, sells the casino chips for a fee, and receives a piece of the income stream through foreign websites in order to maintain the charade that Valve is not promoting and profiting from online gambling, like a modern-day Captain Renault from Casablanca[9].  The value of Skins has gone up because of the gambling marketplace Valve created, sustains and supports, and Valve has directly profited from the sale of Skins, in addition to third-party business ventures such as the league based on CS:GO.  That most of the people in the CS:GO gambling economy are teenagers and/or under 21 makes Valve's and the other unnamed co-conspirators' actions even more unconscionable.

## PARTIES, JURISDICTION AND VENUE

13.     Defendant Valve is a Washington Corporation headquartered at 10900 NE 4th St., Suite 500, Bellevue, Washington 98004. Valve is authorized to conduct business and does conduct business throughout the State of Connecticut.  Valve is the publisher and developer of the videogame Counter Strike: Global Offensive.

---

[9] https://www.youtube.com/watch?v=qmywwiZth5E

5

14.     Plaintiff Michael John McLeod is a resident and citizen of Fairfield County, Connecticut and a customer of Valve since 2014. He is an on-line player of CS:GO and has entered into wagering as described *infra*. Specifically, Plaintiff purchased CS:GO from Defendant, purchased numerous Skins, gambled them and lost money, and knew that he could cash out the value of the Skins for real money prior to losing them while gambling.

15.     This Court also has original jurisdiction over this action pursuant to 28 U.S.C. § 1331 because one of Plaintiff's civil claims arises under the Constitution, laws or treaties of the United States, specifically, violation of 18 U.S.C. § 1962.

16.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367 because the state law claims are so closely related to the claims in which the Court has original jurisdiction that they form part of the same case or controversy.

17.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 as a substantial portion of the events and conduct giving rise to the claims occurred in this District.

## FACTUAL BACKGROUND

### A.     The Rise Of E-Sports and CS:GO

18.     Valve has manufactured video games for nearly 20 years.  In 1999, it introduced the Counter-Strike series, culminating in CS:GO's release in 2012.

19.     CS:GO was one of many similar video games involving players who play as either terrorists or counter-terrorists.  Because the player views the video game through the eyes of a character and shoots guns, it is known as a "first person shooter" game.  When CS:GO was released in 2012, the market was flooded with such franchise as Call of Duty, Halo and Battlefield.

20.     Seeking to differentiate itself, CS:GO introduced Skins.  The announcement made was August 14, 2013 through an announcement posted on its website titled "The Arms Deal Update" ("Skins Announcement").[10]

21.     The Skins Announcement told players that they could "experience all the illicit thrills of black market weapons trafficking without any of the hanging around in darkened warehouses getting knifed to death."  Specifically, "[t]he Arms Deal Update lets you collect, buy, sell and trade over 100 all-new decorated weapons that you can equip in-game."

22.     The Skins Announcement discussed how the new marketplace would work: "You can start collecting decorated weapons via timed weapon drops just by playing CS:GO on official and community servers. You can also get them by opening dropped weapon cases with the appropriate key, or by trading with other players through Steam's Trading interface. Additionally, any decorated weapons you've found, bought or traded can be sold on the Steam Marketplace."

23.     Valve directed players to Reddit (the "front page of the internet" forum website with numerous sub-forums for specific interests), the Steam Community Discussions and the CS:GO Forums on steampowered.com for more information and to discuss Skins.

24.     Steam and steampowered.com are wholly owned properties of Valve. Steam operates as a wholly enclosed ecosystem wherein players can play games, communicate with other players, initiate trades with other players, list items for sale, buy games, buy items, deposit money into their "Steam Wallet," participate in forum discussions, and communicate with Valve directly.

25.     When items are bought and sold on the Steam Marketplace, Valve Steam takes a 5% cut on all total sales, and an additional percentage depending on the game the item is related

---

[10] http://blog.counter-strike.net/index.php/2013/08/7425/

to. If a sale is related to CS:GO, Steam takes an additional 10%, resulting in a 15% fee in all marketplace sales related to CS:GO.

26.     The creation of Skins was a deliberate attempt by Valve to increase its sales and profits by adding an element of gambling and market economies to its products.  And it worked: as a result of the gambling ecosystem, explained in depth below, that grew up around CS:GO Skins, the number of players on CS:GO increased more than 1,500 percent, and CS:GO became the subject of televised and monetized eSports.  Despite its slow initial sales, Valve has now sold more than 21 million copies of CS:GO, earned more than $567 million in total revenue from sales of CS:GO alone, and earned a percentage of gambling proceeds on CS:GO through various websites and third parties.[11]

27.     This was a deliberate strategy on Valve's part.  One of its employees explained at a developer's conference in 2014 that the company determined that the "best way to get players deeply engaged in games…was to give away virtual items of random value and encourage a robust market to trade them."  That employee was quoted as saying: "This is not an accident.  This is by design.  We see more blogs popping up and more and more emails from our players saying, 'I'm not really sure what happened but I've been playing DotA for the last week or two, and I made $100 selling these items that I got.'  This is hugely successful for us."[12]  "DotA" refers to Defense of the Ancients, another Valve game with a similar Skin gambling ecosystem like CS:GO.

28.     Valve went so far as to hire an internationally renowned economist to help it develop currencies and cross-platform economies.[13]

---

[11] http://www.bloomberg.com/features/2016-virtual-guns-counterstrike-gambling/
[12] http://www.bloomberg.com/features/2016-virtual-guns-counterstrike-gambling/
[13] http://www.bloomberg.com/features/2016-virtual-guns-counterstrike-gambling/

29.     The results were stunning: in addition to TBS broadcasting video games on television, eSports matches have sold out arenas, are watched by tens of millions of viewers online and created a multi-billion dollar global gambling marketplace.

30.     There is an increase in betting - and therefore the purchase of Skins on Valve's website - during televised eSports.  Since TBS debuted CS:GO matches, as many as 3.38 million skins were bet on matches on Lounge.   The average value of Skins traded across various platforms was $9.75.  The total "handle" - that is, dollars wagered - is more than $33 million. The matches televised in TBS result in the highest amount of wagering.[14]

31.     Valve receives a direct financial benefit from televised CS:GO matches.

32.     The online gambling ecosystem around CS:GO is illegal in the United States.

33.     Valve had no license, permission or legal authority to create, sustain, profit from or otherwise support an online gambling platform, and, as discussed more in depth below, Valve's affirmative actions both created this online gambling system and allow it to continue.

**B.      The Mechanics of Gambling On CS:GO And How Valve Has Created, Facilitated, Fostered and Affirmatively Allowed Skins Gambling**

34.     Valve sells Skins through its website and Steam platform.  Valve takes a 15% fee on all CS:GO Skins sold through its website or sold on its Marketplace.

35.     These Skins can be won, bought, trade, sold, and otherwise have in-game value through Steam's marketplace and the CS:GO game itself.  It also sells versions of Skins called Knives using the same system.[15]

36.     Unlike apps and other computer games with such in-game purchases, Valve has created and currently supports a secondary marketplace where these in-game purchases can be gambled and cashed out.

---

[14] http://www.esportsbettingreport.com/eleague-handle-for-skin-betting/
[15] http://www.pcgamer.com/how-400-virtual-knives-saved-counter-strike/2/

37.     Skins, in gambling terms, can be seen as casino chips.

38.     CS:GO matches happen all day every day, and at any given time there are as many as 380,000 people playing CS:GO online.[16]

39.     In addition to the TBS-televised games, there are online broadcasts on websites such as Twitch.  In any given match, viewers may pick which team they think is going to win.  The people who bet on the outcome of the eSports match do not play in it and have no control over the outcome.

40.     "People buy skins for cash, then use the skins to place online bets on pro CS:GO matches.  Because there's a liquid market to convert each gun or knife back into cash, laying a bet in skins is essentially the same as betting with real money."[17]

41.     Players must link their Steam account to third party websites such as OPSkins and Skins Gambling Websites in order to be able to gamble or cash out their Skins on the third-party sites.

42.     OPSkins and Skins Gambling Websites have their own accounts on the Steam marketplace that are used to facilitate transfers, sales and gambling.  That is, if a user logs into a Skins Gambling Website and wants to gamble, technically they transfer their skins to the Skins Gambling Website's own Steam account, or one of that Skins Gambling Website's numerous "bot" accounts.  If the user wins, the Skins Gambling Website transfers those Skins back to the user's Steam account.  OPSkins does the same and has numerous Steam accounts of its own to facilitate users turning Skins into cash.

43.     These third party websites require permission and cooperation from Valve in order to access a player's account on Steam, and Valve specifically allows players to transfer

---

[16] http://www.bloomberg.com/features/2016-virtual-guns-counterstrike-gambling/
[17] http://www.bloomberg.com/features/2016-virtual-guns-counterstrike-gambling/

skins to third-party accounts on the Steam Marketplace. Valve allows this knowing exactly what these sites' accounts are, what users are doing, and is affirmatively supporting these transactions, and receiving income from transactions on these sites. "The gambling sites run on software built by Valve, and whenever CS:GO skins are sold, the game maker collects 15 percent of the money."[18]

44.   Upon information and belief, Valve has an ownership interest, partnership or otherwise a direct business relationship with Lounge.

45.   Valve has helped develop the gambling economy and third-party sites and has worked with the third-party sites such as Lounge to continue operations.  Valve affirmatively facilitates the gambling through allowing third-parties to create thousands of accounts through automation, "whitelists" or other shortcuts, and knowingly allows these steps of the gambling process to occur within the Steam marketplace.

46.   For instance, in January 2015, Valve instituted a new security measure that required users to prove they were real human beings known as a "Captcha" tool.  Valve did this in order to "prevent malware on users' machines making trades on their behalf."   However, Valve specifically "excluded a few of the existing third-party trading services from this requirement so they can continue to function."[19]  Those third-party trading services are sites like OPSkins and the Skins Gambling Websites that use hundreds and/or thousands of Steam accounts to facilitate gambling.[20]

---

[18] http://www.bloomberg.com/features/2016-virtual-guns-counterstrike-gambling/
[19] http://steamcommunity.com/groups/tradingcards/discussions/1/622954023422884592/
[20] https://www.reddit.com/r/Steam/comments/3lvvao/how_safe_are_third_party_websites_that_allow_you/;
http://steamcommunity.com/id/drunkenf00l/

47.     Valve is well aware of the Skins gambling that goes on, is well aware that Skins have real world cash value, which has increased their popularity and value, and actively encourages and facilitates Skins gambling.

48.     For instance, in order to stem the increased hacking, fraud and other harms to consumers that had arisen out of Skins gambling in 2015, Valve introduced new security measures.  Valve announced these measures on December 9, 2015, in a post called "Security and Trading" on the Steam marketplace website.[21]

49.     In this post, Valve wrote: "Account theft has been around since Steam began, but with the introduction of Steam Trading, the problem has increased twenty-fold as the number one complaint from our users… This was an unacceptable status quo and we needed to address it. In revisiting our strategy to stop it, we found two things of note. First, enough money now moves around the system that stealing virtual Steam goods has become a real business for skilled hackers. Second, practically every active Steam account is now involved in the economy, via items or trading cards, with enough value to be worth a hacker's time. Essentially all Steam accounts are now targets."[22]

50.     Valve admitted that it knew Skins had real world cash value: "If hackers couldn't move the stolen goods off the hacked account, then they couldn't sell them for real money, and that would remove the primary incentive to steal the account."[23]

51.     Valve thus knows and has admitted that its in-game Skins have real world value through third-party websites it knowingly supports and assists on the Steam Marketplace.

52.     Valve could have stopped this hacking and theft perpetrated against consumers - again, mostly teenagers - by "removing trading" - but chose not to.  Instead, Valve instituted new

---

[21] http://store.steampowered.com/news/19618/
[22] http://store.steampowered.com/news/19618/
[23] http://store.steampowered.com/news/19618/

two-factor security and an "escrow" system where Valve held onto items for a short period of time before delivery between users' accounts and third-party bot or trading accounts.[24]

53.     Valve is aware that users get scammed from gambling bots operating inside the Valve Marketplace, and has a Support Frequently Asked Question to deal with this called "Gambling Bot Trade Offer":  "A fake gambling bot tells you that you have won an item jackpot, but in order to receive the items, you must first accept their trade offer. After receiving your items, the user blocks your messages and keeps your items. Tip: Never trade an item away when prompted by another user or bot if you cannot verify their claim."[25]

54.     In the summer of 2015, Valve was notified of potential match-fixing, and worked with a European e-sports league to ban the alleged perpetrators. Valve admitted it could monitor players' accounts for activity consistent with gambling and match-fixing.  It also introduced a new rule: "[p]rofessional players, teams and anyone involved in the production of CS:GO events, should under no circumstances gamble on CS:GO matches, associate with high volume CS:GO gamblers, or deliver information to others that might influence their CS:GO bets." [26]

55.     On its own website, Valve explained this decision in greater detail, in the screenshot and full text reproduction below, emphasis by Valve in the original[27]:

> We frequently sponsor third-party events to add to their entertainment value for viewers
> and broaden the audience for competitive CS:GO. To be eligible to participate in a
> Valve-sponsored event, players are required to follow the rules provided by that event's
> organizers.  In addition to that organizer's rules, we expect that players who plan to
> participate in any future Valve-sponsored event will hold themselves to a high standard
> of professional integrity.   Professional players, teams, and anyone involved in the
> production of CS:GO events, should under no circumstances gamble on CS:GO matches,
> associate with high volume CS:GO gamblers, or deliver information to others that might
> influence their CS:GO bets. To clarify – as a professional player, team manager or event

---

[24] http://store.steampowered.com/news/19618/
[25] https://support.steampowered.com/kb_article.php?ref=3415-WAFH-6433&l=english
[26] http://en.esl-one.com/csgo/katowice-2015/news/update-on-the-offline-qualifier-including-disqualifications-invites-and-more/
[27] http://blog.counter-strike.net/index.php/unnecessary_risks/

production staff, it is common to have personal relationships and/or privileged information about other teams and players. **Because of this, we will always assume that you have access to private CS:GO-related "inside information" that might give you an unfair advantage when placing a bet on any CS:GO game or match.** Betting using inside information, or even the perception or suspicion thereof, carries a significant risk of damaging your personal brand, your team, your community, and may lead to exclusion from future Valve-sponsored events. To avoid these risks, we recommend that you never bet on any CS:GO game or match. This recommendation applies both to current professional players and anyone who wishes to participate in a Valve-sponsored CS:GO event in the future. It's important to consider the substantial impact an individual professional Counter-Strike player has on the health and stability of the sport. Performing before an audience of millions of fans, you are ambassadors for your game – the strength of professional Counter-Strike comes from the integrity of its players and teams.



56.     Some gambling sites, such as Diamonds, don't even require players to wager on the outcome of eSports matches, and simply operate roulette-style games where people risk

Skins to win more Skins based on the roll of the dice or the outcome of random number generators[28]:



57.    As the above screenshot shows, the STEAM logo is prominently displayed and users must login through STEAM to access and bet their Skins.

58.    Valve employees communicate directly with Lounge and provide technical support to the website, according to a Lounge employee and spokesperson.[29] The Valve logo is displayed prominently on the website and users must login to their Steam account to wager on matches on Lounge[30]:

[28] http://csgodiamonds.com/#/
[29] http://www.bloomberg.com/features/2016-virtual-guns-counterstrike-gambling/
[30] https://csgolounge.com/



59.     In a post on Valve's forum, a moderator — that is, a Valve spokesperson who manages the forums on behalf of Valve — told "younger" users who think they have been scammed through third party sites such as Lounge to not post on the forums about it.  Rather, those "younger" users who were scammed on a third-party gambling site should contact Valve directly.[31]  In this post, the moderator on Steam's own forums told users, including its "younger" users: "Safe betting and trading!"[32]

60.     Despite these connections, Lounge claims on its website that it is not affiliated with Steam or Valve:

---

[31] http://www.bloomberg.com/features/2016-virtual-guns-counterstrike-gambling/
[32] http://steamcommunity.com/groups/csgolounge/discussions/8/627456486705186974/



61.     The above screenshot shows where users are taken when they attempt to place a bet on a match on Lounge - they must login to their Steam account through Steam/Valve's website.

62.     Lounge acts as a sports book or pool betting system: it takes bets on each side of matches and takes a fee from the transaction, which it then, upon information and belief, shares with Valve.

63.     Finally, once users have accumulated Skins or Knives in their Steam accounts through third-party gambling sites, they can convert them to cash through OPSkins.

64.    OPSkins, based in Canada, links directly to a user's Steam account as well[33]:





65.    Users on OPSkins can cash out their Skins for real money through their PayPal accounts.

66.    CSGOSpeed allows users to play various casino-style games, such as roulette, coin flips, jackpots, blackjack and match betting on CS:GO matches:



67.    Users must login to Speed through their Steam account:



68.     CSGO Crash is a Skins gambling website where users place bets and try to cash out before an arbitrary "crash" occurs on the website.   Users must login through their Steam account:



69.     SkinArena is a raffle and gambling website using Skins that requires users to login through their Steam account:



70.     Thus, users deposit real money on Valve's website, connect that real money account to nominally third-party websites with direct connections to Valve where users can participate in various forms of gambling, and then cash out their account balances, converting Skins into real money.

71.     This is an illegal scheme designed to bypass state-by-state gambling laws.

**C.     How Unregulated Gambling Harms Consumers**

72.     Because Valve has helped to create an unregulated, international gambling concern with no oversight that targets teenagers specifically, Plaintiff and the class have been damaged.

73.     This unregulated market is ripe for scams, cheating, fraud and other harms to users.  For instance, there have been numerous instances of match-fixing in CS:GO matches: in January 2015, it became clear that a highly qualified team of CS:GO players fixed matches against lesser teams.[34]

74.     In 2016, "reports of a particularly high-profile incident reached Valve, and the company contacted CSGO Lounge to help identify the culprits….  In the end, Valve banned seven players from events it sponsors, and forbade professional players and team staff from gambling on matches, associating with high-volume gamblers, or sharing inside information."[35]

75.     In June 2016, Diamonds admitted it was providing a sponsored player with advance notice when he would win spins on its site, so that the user would record himself playing and winning, post this video to YouTube and social media sites, and generate excitement and new users for Diamonds' website.[36]

---

[34] http://www.dailydot.com/esports/match-fixing-counter-strike-ibuypower-netcode-guides/
[35]  http://www.bloomberg.com/features/2016-virtual-guns-counterstrike-gambling/
[36] http://www.esportsbettingreport.com/csgo-diamonds-skin-betting-m0e/;
http://www.twitlonger.com/show/n_1sopll1

### D.    Plaintiff's Specific Allegations

76.    Plaintiff first purchased CS:GO and made deposits into his Steam wallet when he was a minor child under the age of 18.   Therefore, arbitration agreement Valve may seek to enforce is an unenforceable contract for numerous reasons, not limited to the inability of minors to enter into legally binding contracts.

77.    Indeed, Valve is well aware that their users are teenagers.   Steam's account requires you to check a box indicating you are 13 years of age or older, and does not require you to read the Subscriber Agreement before creating a Steam account[37]:



---

[37] https://store.steampowered.com/join/?

78.     Plaintiff signed into his Steam account through the third-party websites Lounge, Speed, Arena and Crash, all before he turned 18.

79.     Plaintiff purchased CS:GO on February 10, 2015.  He created his Steam account well before this, when he was 15 or 16 years old.

80.     Plaintiff purchased Skins, cases and keys from Valve and paid Valve a fee to do so on numerous occasions, including, but not limited to, July 25, 2015, July 26, 2015, August 3, 2015, December 25, 2015, February 5, 2016, May 6, 2016 and as far back as February 15, 2015.

81.     Plaintiff was aware Skins had real world value and could be cashed out on sites such as OPSkins.

82.     Plaintiff then used those Skins to place bets on Lounge, Speed, Arena and Crash through trading Skins to each via their Steam account, hosted and facilitated by Valve, and lost Skins, and therefore the real world cash value of these Skins, in these transactions.

83.     He had transactions with Speed on June 19, 2016, transactions with Arena on August 1, 2015, July 27, 2015, Lounge on May 28, 2015, March 23, 2015 and March 22, 2015. He lost Skins with real world value in these transactions, and won a Skins jackpot in one transaction.  He was a minor during the vast majority of these transactions.

## CLASS ALLEGATIONS

84.     A class action is the proper form to bring Plaintiffs' claims under FRCP 23. The potential Class is so large that joinder of all members would be impracticable. Additionally, there are questions of law or fact common to the Class, the claims or defenses of the representative parties are typical of the claims or defenses of the Class, and the representative parties will fairly and adequately protect the interests of the Class.

85.     This action satisfies all of the requirements of FRCP, including numerosity, commonality, typicality, adequacy, predominance and superiority.

86.     **Numerosity**: the Class is so numerous that joinder of all members is impracticable.  While the exact number is not known at this time, it is generally ascertainable by appropriate discovery.  News accounts discuss how millions of users compete on the websites of Defendant and its unnamed co-conspirators.

87.     **Commonality:** the claims made by Plaintiff meet the commonality requirement because they present shared questions of law and fact, and resolving these questions will resolve the classwide litigation. These shared questions predominate over individual questions, and they include, without limitation:

      a.  Whether Plaintiff and members of the Class entered into contracts with Defendant over the past four years;
      b.  Whether such contracts are *per se* void, pursuant to Connecticut law;
      c.  Whether such contracts are void pursuant to Connecticut civil law;
      d.  Whether the Terms of Use are unconscionable, illusory, fraudulent, or otherwise invalid;
      e.  Whether Plaintiff and members of the Class paid monies to Defendant in consideration of those contracts;
      f.  Whether Defendant's operations and third-party websites Defendant supports are a game of chance under all applicable laws and rules;
      g.  Whether Defendant's operations violate Connecticut law;
      h.  Whether Plaintiff and members of the Class are entitled to restitution and entitled to recovery of lost wagers from Valve or the disgorgement of profits from Valve's profits in illegal gambling;
      i.  Whether Defendant acted in concert with other CSGO gambling sites to condone, allow, or promote the practice of betting and gambling through the use of CSGO items;
      j.  Whether Defendant was negligent or otherwise acted wrongfully in allowing and encouraging users to utilize its service to bet and gamble on CSGO games;
      k.  Whether Defendant owed duties to the Plaintiff and the proposed Class members, the scope of those duties, and if they breached those duties;
      l.  Whether consumers such as the Plaintiff and the proposed Class members were harmed by Defendant's actions, as described in detail above;
      m.  The extent of the damages caused by the Defendant's acts; and
      n.  Whether Defendant violated Connecticut state consumer protection statutes, as well as the consumer protection statutes of other states.

88.    **Typicality**: Plaintiffs' claims are typical of those of the other Class members because Plaintiffs, like every other Class member, was induced to use Defendant's sites based on false and misleading advertisements of fair play, and lack of information about having to compete against players with inside information.

89.    The claims of the Class Representative Plaintiff are furthermore typical of other Class members because they make the same claims as other class members. Plaintiff has an interest in seeking compensation from Defendant.

90.    **Adequacy**: Plaintiff will fairly and adequately represent and protect the interests of the Class in that he has no disabling conflicts of interest that would be antagonistic to those of the other members of the Class. Plaintiff seeks no relief that is antagonistic or adverse to the members of the Class and the infringement of the rights and the damages he has suffered are typical of other Class members.

91.    **Superiority:** The class litigation is an appropriate method for fair and efficient adjudication of the claims involved. Class action treatment is superior to all other available methods for the fair and efficient adjudication of the controversy alleged herein; it will permit a large number of class members to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort and expense that hundreds of individual actions would require. Class action treatment will permit the adjudication of relatively modest claims by certain class members, who could not individually afford to litigate a complex claim against large corporate defendants. Further, even for those class members who could afford to litigate such a claim, it would still be economically impractical.

92.     The nature of this action and the nature of Connecticut and federal laws available to Plaintiff and the Class makes the use of the class action device a particularly efficient and appropriate procedure to afford relief to Plaintiff and the Class for the wrongs alleged. Without the class action mechanism, Defendant would necessarily gain an unconscionable advantage since it would be able to exploit and overwhelm the limited resources of each individual Class member with superior financial and legal resources; and the costs of individual suits could unreasonably consume the amounts that would be recovered. Likewise, proof of a common course of conduct to which Plaintiff was exposed is representative of that experienced by the Class, and will establish the right of each member of the Class to recover on the cause of action alleged; and Individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

93.     The proposed Class is described as follows:

> **"All persons in the United States whose money was used to purchase Skins in any account with Defendant and/or its unnamed co-conspirators"**

94.     Plaintiff reserves the right to modify or amend the definition of the proposed class and to modify, amend or remove proposed subclasses, before the Court determines whether certification is appropriate and as the parties engage in discovery.

95.     Plaintiff will fairly and adequately protect the interests of the Class. The interests of the class representative are consistent with those of the other members of the Class. In addition, Plaintiff is represented by experienced and able counsel who have expertise in the areas of tort law, trial practice, and class action representation.

96.     The class action is superior to all other available methods for the fair and efficient adjudication of this controversy. Because of the number and nature of common questions of fact and law, multiple separate lawsuits would not serve the interest of judicial economy.

97.     Excluded from the Class are:
   a.     Defendant and any entities in which Defendant has a controlling interest;
   b.     Any entities in which Defendant's officers, directors, or employees are employed and any of the legal representatives, heirs, successors, or assigns of Defendant;
   c.     The Judge to whom this case is assigned and any member of the Judge's immediate family and any other judicial officer assigned to this case;
   d.     All persons or entities that properly execute and timely file a request for exclusion from the Class;
   e.     Any attorneys representing the Plaintiff or the Class.

## COUNT I
## RESTITUTION PURSUANT TO CT GEN. STAT. SECTION 52-553, et seq.

98.     Plaintiff, on behalf of himself and the proposed Class, repeats and realleges all preceding paragraphs as if fully set forth herein.

99.     Connecticut General Statutes Section 53-278(a), et seq., defines gambling in a manner that encompasses the activities by Valve, OPSkins and Skins Gambling Websites.

100.    Section 52-553 renders all contracts for gambling null and void.

101.    Section 52-554 allows any person, such as Plaintiff, who lost money pursuant to any illegal contract to recover such losses.

102.    Plaintiff and members of the Class entered into contracts with Lounge, OPSkins and Skins Gambling Websites that are void. Specifically, Plaintiff created a Steam account in 2014 and entered into transactions with Defendant in which he purchased Skins as described above. He then gambled the Skins, frequently betting Skins worth $5 each and losing their equivalent cash value.

28

103.    Plaintiff purchased and gambled Skins as a minor, and later as an adult.

104.    Plaintiff and members of the Class paid monies in consideration of these contracts that are void.

105.    Accordingly, Plaintiff and members of the Class are entitled to damages in the form of restitution for monies paid in connection with these void contracts over the course of the past four (4) years.

**COUNT II**
**UNJUST ENRICHMENT**

106.    Plaintiff, on behalf of himself and the proposed Class, repeats and realleges all proceeding paragraphs as if fully set forth herein.

107.    Plaintiff and members of the proposed Class conferred a benefit on Defendant by purchasing CS:GO, depositing money, purchasing in-game items, and playing in contests on various websites with which Valve had a financial relationship.

108.    Defendant has further benefited from monetarily from unlawful and/or illegal conduct directed to its customers in Connecticut, including from Plaintiff and members of the class.

109.    Defendant's benefit came at the expense and detriment of Plaintiff and Class members.

110.    Defendant has thus unjustly enriched itself in retaining the revenues derived from enforcement of illegal contracts, deposits, wagers, purchases and gambling by Plaintiff and the members of the proposed class, which retention under these circumstances is unjust and inequitable because Defendant entered into or caused to be created illegal, voidable, and unconscionable gambling contracts with Plaintiff and other members of the proposed class, and

29

has created an illegal international gambling economy operating in the United States and targeted at teenagers.

111.    Defendant has benefited from its creation of an illegal gambling scheme through the creation of Skins and the assistance provided to international companies that provide ways to gamble Skins and convert in-game Skins with no cash value into cash value.  Defendant has also benefited from the creation of an illegal gambling market by inflating the value of Skins, something with no intrinsic value, which it then sells for a fee.  Defendant has also benefited from the increased sales, increased exposure, marketing revenue, sponsorship revenue and other financial benefits that CS:GO has brought Valve because of its popularity, which is due almost entirely to Skins gambling.

112.    Plaintiff and members of the proposed class were injured as a direct and proximate result of Defendant's illegal activities because they paid for items and wagers that were unregulated, illegal gambling activities ripe for fraud, abuse and theft, and with no way of knowing whether they were fairly run.

113.    Because Defendant's retention of the non-gratuitous benefit conferred on it by Plaintiff and the members of the proposed class is unjust and inequitable, Defendants must pay restitution to Plaintiff and the members of the proposed class for its unjust enrichment, as ordered by the Court.

114.    Equity and good conscience require that Defendant disgorge its profits made thereby, and Plaintiff and members of the class further seek restitution on this basis.

**COUNT III**
**VIOLATION OF 18 U.S.C. § 1962**

115.    Plaintiff, on behalf of himself and the proposed class, repeats and realleges all preceding paragraphs as if fully set forth herein.

116.   The Skins Gambling Websites, Valve, and OPSkins are all "persons" under 18 U.S.C. § 1961(3).

117.   Valve, Skins Gambling Websites, and OPSkins's illegal gambling businesses involve five or more persons who conduct, finance, manage, supervise, direct and/or own all or part of Valve, Skins Gambling Sites, and OPSkins, within the meaning of 18 U.S.C. § 1955.

118.   Pursuant to 18 U.S.C. § 1962:

> It shall be unlawful for any person who has received any income derived, directly or indirectly, form a pattern of racketeering activity or through collection of an unlawful debt… to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

119.   Valve and the other non-defendant third-parties identified above in Paragraph 5 named in this count violated 18 U.S.C. § 1962(c) by participating in, facilitating, or conducting the affairs of the Valve, Lounge, OPSkins and/or Diamonds RICO Enterprise through a pattern of racketeering activity.

120.   Valve, OPSkins, Skins Gambling Websites are operating illegal online gambling websites within Connecticut. Skins Gambling Websites and OPSkins all depend on Valve to operate their businesses to facilitate gambling, trades of items, as well as item sales. These entities also rely on a third-party market, like the one hosted by OPSkins and other websites, in order to provide a way for gamblers to cash out their in-game items for cash value, to process these payments, and to set the real world valuation for these items.

121.   Skins Gambling Websites, OPSkins and Valve are the ringleaders of their respective illegal gambling enterprises, as set forth herein.

122.   Independently and collectively, Valve is responsible for facilitating the growth of the illegal internet gambling enterprises, such as those operated by Skins Gambling Websites and

OPSkins, that blossomed into billion dollar business because they created and provided legitimacy and support for what is, in fact, an illegal gambling activity.

123.    Valve provided money, technical support, and advice for Skins Gambling Websites and OPSkins, providing legitimacy to the illegal gambling that was occurring, continues to occur, and by permitting Skins Gambling Websites and OPSkins to use their logo and infrastructure to attract more bettors.

124.    Plaintiff placed bets on multiple contests through Skins Gambling Websites. The wagers allow these sites to operate and profit. The bets were facilitated by Valve, and Valve permits users to buy and sell the winnings of such bets on OPSkins.

125.    Valve has a direct interest in the operation of OPSkins and Skins Gambling Websites because Valve profits directly and indirectly through the online gambling websites.

126.    Valve's processing of transactions facilitated by Skins Gambling Websites and OPSkins illegal gambling scheme, implicates Valve and OPSkins into Skins Gambling Websites gambling scheme by directing, conducting, guiding, and participating, directly or indirectly, in the conduct of an enterprise through a pattern of racketeering activity and/or collection of an unlawful debt.

127.    As a result of Defendant's actions, Plaintiff has suffered financial losses.

128.    Plaintiff and class members are "person[s] injured in his or her business or property" by reason of Skins Gambling Websites' and OPSkins's and Valve's violation of RICO within the meaning of 18 U.S.C. § 1964(c).

129.    The acts alleged herein occurred more than three times and on a daily bases.

130.    Pursuant to 18 U.S.C. § 1964, Plaintiff is entitled to recover treble damages, costs and attorneys' fees for his damages proximately caused by Defendant's RICO enterprise.

A.      **Predicate Act – Violation of 18 U.S.C. § 1955**

131.    Independently and collectively, Valve and the unnamed co-conspirators in this Count are responsible for the growth of the illegal enterprise to become a multi-billion dollar business by providing legitimacy to what was, in fact, an illegal activity. The mere act of allowing Plaintiff, and other members of the Class, to sign into Steam through Skins Gambling Websites and OPSkins bolstered the credibility of the illegal enterprises in the eyes of unsuspecting bettors.

132.    Valve and the unnamed co-conspirators all committed a Predicate Act under RICO, violation 18 U.S.C. § 1955, which provides in relevant part:

> (a) Whoever conducts, finances, manages, supervises, directs, or owns all or part of an illegal gambling business shall be fined under this title or imprisoned not more than five years, or both.
> (b) As used in this section—
> i. "Illegal gambling business" means a gambling business which—is a violation of the law of a State or political subdivision in which it is conducted; involves five or more persons who conduct, finance, manage, supervise, direct, or own all or part of such business; and has been or remains in substantially continuous operation for a period in excess of thirty days or has a gross revenue of $2,000 in any single day.
> **
> (4) "gambling" includes but is not limited to pool-selling, bookmaking, maintaining slot machines, roulette wheels or dice tables, and conducting lotteries, policy, bolita or numbers games, or selling chances therein.
> **
> (6) "State" means any State of the United States, the District of Columbia, the Commonwealth of Puerto Rico, and any territory or possession of the United States.

133.    Valve, Skins Gambling Websites and OPSkins are illegal gambling businesses because they meet all three elements of 18 U.S.C. § 1955(b)(1-3).

134.    Valve, Skins Gambling Websites and OpSkins are each "illegal gambling business" within the meaning of 18 U.S.C. § 1955(b)(1), because, as set forth herein, each of their activities violate all state laws and at a minimum, Connecticut. "State" means any State of the United States. 18 U.S.C. § 1955(b)(6).

135.    Valve, Skins Gambling Websites and OpSkins are each an "illegal gambling business" within the meaning of 18 U.S.C. § 1955(b)(2), because each respective business involves five or more persons who conduct, finance, manage, supervise, direct, or own all or part of the business.

136.    Valve, Skins Gambling Websites and OpSkins are each an "illegal gambling business" within the meaning of 18 U.S.C. § 1955(b)(3), because each have been or remain in substantially continuous operation since at least January 1, 2013, for a period in excess of thirty days or has a gross revenue of $2,000 in any single day.

    **B.    The Online Gambling RICO Enterprises**

137.    The following persons, and others presently unknown, have been members of and constitute an "association-in-fact enterprise" within the meaning of RICO,:

138.    **Skins Gambling Websites**, who: 1) created an illegal gambling enterprise; 2) knowingly created and conducted illegal gambling activities in violation of all state laws and at a minimum, Connecticut in return for payment of items of value, including significant sums of money; 3) conducted, directed, managed, supervised, directed and owned an illegal gambling business in violation of 18 U.S.C. § 1955.

139.    **Valve**, who: 1) knowingly facilitated the transactions required to conduct the illegal gambling operations of CSGO Lounge and CSGO Diamonds; 2) provided technical support and know-how to CSGO Lounge and CSGO Diamonds to permit them to link their own database of users with Steam users. By virtue of this support, implicit promotion and endorsement of Defendant's illegal internet gambling enterprises, Valve thereby gave credibility and legitimacy to these defendants and thus attracted more players to participate as customers in an illegal gambling enterprise.

34

140.   **OPSkins**, who: 1) knowingly facilitated transactions of users buying, selling, and general cashing-out of items users gained through participation on Skins Gambling Websites illegal gambling enterprises. This support entices and attracts users of all ages to participate on defendants gambling websites so that they might win more valuable items in the hopes of being able to turn an in-game currency into real money.

141.   **Skins Gambling Websites**, each of which engaged in, and whose activities affected interstate and foreign commerce, is an association-in-fact of individuals and corporate entities within the meaning of 18 U.S.C. § 1961(4) and consists of "persons" associated together for a common purpose. Each RICO enterprise had an ongoing organization with an ascertainable structure, and functioned as a continuing unit with separate roles and responsibilities.

142.   Valve, Skins Gambling Websites and OpSkins each participated in the RICO enterprise, but also had an existence separate and distinct from the enterprise.

143.   At all relevant times, Valve, Skins Gambling Websites, and OpSkins operated, controlled, or managed their respective CSGO gambling services through a variety of actions.

144.   Valve, Skins Gambling Websites, and OpSkins participation in the RICO enterprise was necessary for the successful operation of its scheme to conduct an illegal gambling enterprise, both companies controlled and monitored all aspects of eGaming betting and gambling on its respective website and concealed the nature and scope of the illegal gambling enterprise and profited from such concealment.

145.   The members of the gambling enterprise served a common purpose: to maximize profits on their respective illegal gambling sites and to collect as many rare in-games item as possible in order to profit from the resale of these items on the third-party market through the use of user fees and bets.

C.        **The Pattern of Racketeering Activity**

146.    Valve, Skins Gambling Websites, and OpSkins conducted and participated in the conduct and the affairs of their respective Online Gambling Enterprises through a pattern of illegal internet gambling pursuant to violations of 18 U.S.C. §1955 thereby constituting racketeering activity that has lasted for several years beginning no later than January 1 2013 and continuing to this day, and that consisted of numerous and repeated violations of 18 U.S.C. §1955, mail and wire fraud statutes, which prohibit the use of any interstate or foreign mail or wire facility for the purpose of executing a scheme to defraud, in violation of 18 U.S.C. §§ 1341 and 1343.

147.    The purpose of Valve, Skins Gambling Websites, and OpSkins and the scheme to violate 18 U.S.C. § 1955 was to profit through illegal internet gambling.

148.    By concealing the scope and nature of each illegal gambling enterprise, Valve, Skins Gambling Websites, and OpSkins also maintained and boosted consumer confidence in their respective illegal internet gambling enterprises, their brands, and e-sports betting, all of which furthered their schemes to defraud and helped both Valve, Skins Gambling Websites, and OpSkins generate more users to play their bet and gamble on their respective sites.

149.    As detailed in this Amended Complaint, Valve, Skins Gambling Websites, and OpSkins were well aware that its enterprise constituted illegal internet gambling under federal and individual United States law. Nonetheless, they used money generated from innocent bettors to intentionally subject Plaintiff and Class Members to those risks or consciously disregarded those risks in order to maximize their profits at the expense of Plaintiffs and Class Members.

150.    To carry out, or attempt to carry out the scheme to defraud, Valve, Lounge, OpSkins and Diamonds each individually conducted or participated in the conduct of the affairs

of their respective RICO Enterprises through the following pattern of racketeering activity that violated 18 U.S.C. § 1955 and employed the use of the mail and wire facilities, in violation of 18 U.S.C. § 1341 (mail fraud) and § 1343 (wire fraud):

    a.  Valve, Skins Gambling Websites, and OpSkins devised and furthered their own schemes to defraud by use of the mail, telephone, and internet, and transmitted, or caused to be transmitted, by means of mail and wire communication travelling in interstate or foreign commerce, user fees and illegal gambling proceeds, writing(s) and/or signal(s), including their respective websites, statements to the press, and communications with other members of their respective RICO Enterprises, as well as the user fees and transactional costs of the illegal internet gambling activities, advertisements and other communications to the Plaintiffs and Class Members; and

    b.  Valve, Skins Gambling Websites, and OpSkins each individually utilized the interstate and international mail and wires for the purpose of obtaining money or property by means of the omissions, false pretense, and misrepresentations described herein.

151.    The Defendants separate pattern of racketeering activity in violation of 18 U.S.C. § 1955 and the use of the mail and wire fraud statutes included but was not limited to the following:

    a.  Knowingly conducting illegal gambling activities that violated, at a minimum, the laws of the state Connecticut and thereby also violating 18 U.S.C. §1955, a RICO predicate act;

b.   By transmitting, causing to be transmitted, by means of mail and wire communication and the internet, by travelling in interstate or foreign commerce, between their offices in Connecticut and various other locations across the United States, communications concealing the illegality of their schemes on their betting websites on a nationwide basis.

152.   The conduct of Valve, Skins Gambling Websites, and OpSkins in furtherance of their respective illegal activities and gaming was intentional. Plaintiff and Class members were directly harmed as a result of Defendant's conduct.

153.   As set forth herein Valve, Skins Gambling Websites, and OpSkins engaged in patterns of related and continuous predicate acts since at least August 1, 2013. The predicate acts constituted a variety of unlawful activities with each conducted with the common goal of defrauding Plaintiff and other Class members and obtaining significant monies and revenues from them while providing an illegal betting website. These predicate acts were related and not isolated events. Further, the predicate acts also had the same or similar results, participants, victims, and methods of commission.

154.   Because of Valve, Skins Gambling Websites, and OpSkins pattern of racketeering activity, Plaintiff and Class members have been injured in their business and/or property in multiple ways, including but not limited to the loss of their items, wagers, and fees lost when wagering and betting.

155.   The violations by Valve, Skins Gambling Websites and OpSkins of 18 U.S.C. § 1955 and 18 U.S.C.§ 1962(c) have directly and proximately caused injuries and damages to Plaintiff and Class members in the form of their losses while betting on defendants' illegal gambling websites. As such, Plaintiff and Class members are entitled to bring this class action

38

for three times their actual damages, as well as injunctive and equitable relief and costs and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c).

156.    As a result of the actions of Valve, Skins Gambling Websites and OpSkins, Plaintiff has suffered losses in an amount to be determined at trial,.

**COUNT IV**
**VIOLATIONS OF THE CONNECTICUT UNFAIR TRADE PRACTICES ACT**
**CONN. GEN. STAT. § 42-110A, ET. SEQ.**

157.    Plaintiff repeats, realleges, and incorporates by reference each of the foregoing allegations as though fully set forth herein.

158.    At all relevant times hereto, the Defendant was prohibited by Section 42-110(b) of the Connecticut General Statutes from engaging in unfair deceptive acts or practices in the conduct of their business in the State of Connecticut. The actions of the Defendant constitute a violation of the Connecticut Unfair Trade Practices Act, Conn. Gen. Stats. Section 42-110a, *et seq.*,in that such actions were immoral, unethical, oppressive, unscrupulous, offend public policy, and caused substantial injury to consumers, including Plaintiff and Class members, and were done with reckless indifference to the rights of the Plaintiff and Connecticut Class members.

159.    The actions of the Defendant as described in this complaint caused the Plaintiff and class members to suffer actual and ascertainable injuries, damages, loss of money and property.

160.    Pursuant to Section 42-110g(c) of the Connecticut General Statutes, a copy of this complaint has been mailed to the Attorney General and the Commissioner of Consumer Protection of the State of Connecticut.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff and members of the proposed class pray for relief and judgment against Defendant, as follows:

a.   For an order certifying the proposed classes, appointing Plaintiff and their counsel to represent the proposed class and notice to the proposed classes to be paid by Defendant;

b.   For damages suffered by Plaintiff and members of the proposed class;

c.   For restitution to Plaintiff and the proposed class of all monies wrongfully obtained by Defendant;

d.   For injunctive relief requiring Defendant to cease and desist from engaging in the unlawful, unfair, and/or deceptive practices alleged in the Complaint;

e.   An order awarding declaratory relief, retrospective and prospective injunctive relief as permitted by law or equity, including enjoining Defendant from continuing the unlawful practices as set forth herein, and injunctive relief to remedy Defendant's past conduct;

f.   For Plaintiff's reasonable attorneys' fees, as permitted by law;

g.   For Plaintiff's costs incurred;

h.   For pre-judgment and post-judgment interest at the maximum allowable rate on any amounts awarded; and

i.   For such other and further relief that this Court deems just and proper under equity or law, including the award of punitive damages.

## JURY DEMAND

Plaintiff demands a trial by jury on all counts so triable.


Dated: June 28, 2016     By: /s/     Neal L. Moskow

Neal L. Moskow, Esq.
Fed. Bar. No. CT 04516
Ury & Moskow, L.L.C.
883 Black Rock Turnpike
Fairfield, CT 06825
Telephone (203) 610-6393
Facsimile: (203) 610-6399
neal@urymoskow.com

Paul C. Whalen (PW1300)
LAW OFFICE OF PAUL C. WHALEN, P.C.
768 Plandome Road
Manhasset, NY 11030
(516) 426-6870 telephone
(212) 658-9685 facsimile
pcwhalen@gmail.com

Jasper D. Ward IV
Alex C. Davis
Patrick Walsh
JONES WARD PLC
Marion E. Taylor Building
312 S. Fourth Street, Sixth Floor
Louisville, Kentucky 40202
Tel. (502) 882-6000
Fax (502) 587-2007
jasper@jonesward.com
alex@jonesward.com
patrick@jonesward.com

*Counsel for Plaintiff and the Proposed Class*